**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CASINO PAUMA, an Enterprise of the Pauma Band of Luiseno Mission Indians of the Pauma and Yuima Reservation, a federally recognized Indian Tribe, *Petitioner*, <br><br> v. <br><br> NATIONAL LABOR RELATIONS BOARD, *Respondent*, <br><br> UNITE HERE INTERNATIONAL UNION, *Intervenor*. | No. 16-70397 <br><br> NLRB No. 21-CA-125450 |

NATIONAL LABOR RELATIONS
BOARD,

*Petitioner*,

v.

CASINO PAUMA, an Enterprise of the
Pauma Band of Luiseno Mission
Indians of the Pauma and Yuima
Reservation, a federally recognized
Indian Tribe,

*Respondent.*

No. 16-70756

NLRB No.
21-CA-125450

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted November 9, 2017
Pasadena, California

Filed April 26, 2018

Before: Richard Linn,[*] Marsha S. Berzon, and Paul J.
Watford, Circuit Judges.

Opinion by Judge Berzon

---

[*] The Honorable Richard Linn, United States Circuit Judge for the
U.S. Court of Appeals for the Federal Circuit, sitting by designation.

## SUMMARY[**]

### Labor Law / Tribal Law

The panel granted the National Labor Relations Board's petition for enforcement of its order; denied Casino Pauma's petition for review; and upheld the Board's conclusions that it may apply the National Labor Relations Act ("NLRA") to the relationship between employees working in commercial gaming establishments on tribal lands and the tribal governments that own and manage the establishments, and that Casino Pauma committed unfair labor practices in violation of the NLRA by trying to stop union literature distribution.

The panel held that the Board affirmatively waived any preclusion defense before this court, deciding instead to litigate the question of its ability to regulate tribes under the NLRA on the merits.

The panel held that although the NLRA was ambiguous as to its application to tribal employers, the Board's determination that such employers were covered by the NLRA was a "reasonably defensible" interpretation of the NLRA. The panel also held that, contrary to Casino Pauma's contentions, application of federal Indian law did not produce a different result in this case. The panel held that there was no conflict between the NLRA and the Indian Gaming Regulatory Act, and concluded that Casino Pauma's compact

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

with California did not displace the application of the NLRA to its activities.

The panel held that there was no exhaustion bar to consideration of Casino Pauma's main argument under *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), that it did not violate NLRA section 8(a)(1) when it prevented employees from distributing union literature to customers in front of the casino. The panel concluded that the Board properly interpreted *Republic Aviation*'s holding concerning NLRA section 7 to reach employees' customer-directed union literature distribution on non-work time in non-work areas of the employer's property. The panel further held that the Board reasonably applied to Casino Pauma its literature distribution rules concerning casinos. The panel held that the Board's conclusion that Casino Pauma violated its employees' NLRA right to distribute union literature was adequately supported, both by the applicable legal principles and the record.

## COUNSEL

Cheryl Ann Williams (argued) and Kevin M. Cochrane, Williams & Cochrane LLP, Temecula, California, for Petitioner.

Heather Stacy Beard (argued), National Labor Relations Board, Washington, D.C.; Kristin L. Martin (argued) and Richard G. McCracken, McCracken Stemerman & Holsberry LLP, San Francisco, California; for Intervenor.

Linda Dreeben, Deputy Associate General Counsel; John H. Ferguson, Associate General Counsel; Jennifer Abruzzo,

Deputy General Counsel; Richard F. Griffin Jr., General Counsel; Heather S. Beard, Attorney; Jill A. Griffin, Supervisory Attorney; National Labor Relations Board, Washington, D.C.; for Respondent.

Lloyd B. Miller and Rebecca A. Patterson, Sonosky Chambers Sachse Miller & Munson LLP, Anchorage, Alaska; Frank S. Holleman, Sonosky Chambers Sachse Endreson & Perry LLP, Washington, D.C.; for Amici Curiae Fort Peck Assiniboine and Sioux Tribes, Port Gamble S'Klallam Tribe, Puyallup Tribe, and Quinault Indian Nation.

Dorothy Alther and Mark Radoff, California Indian Legal Services, Escondido, California; Denise Turner Walsh, Attorney General, Rincon Band of Luiseño Indians, Valley Center, California; for Amici Curiae California Nations Indian Gaming Association, Southern California Tribal Chairmen's Association, California Association of Tribal Governments, and Rincon Band of Luiseño Indians.

**OPINION**

BERZON, Circuit Judge:

We consider whether the National Labor Relations Board ("NLRB" or "the Board") may regulate the relationship between employees working in commercial gaming establishments on tribal land and the tribal governments that own and manage those establishments. After addressing various preclusion questions, we uphold the Board's conclusion that it may apply the National Labor Relations Act ("NLRA") to that relationship, in accord with its usual process. We also consider whether the Board permissibly

applied the rule regarding employee solicitation established in *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798 (1945), to customer-directed union literature distribution, and we hold that it did.

## I.

The Pauma Band of Mission Indians ("Pauma Band" or "Tribe") owns Casino Pauma, located on the Tribe's reservation in Pauma Valley, California. About 2,900 customers visit Casino Pauma each day. The Casino employs 462 employees, five of whom are members of the Pauma Band; the parties stipulated that "[t]he vast majority of [Casino Pauma's] employees and managers are not members of any Native American Tribe."

In 2013, UNITE HERE ("Union") began an organizing drive at Casino Pauma. Over the course of a day in December 2013, nine Casino Pauma employees distributed Union leaflets to customers at the casino's front entrance. Some of the employees stood on the sidewalk at the entrance to the casino's valet driveway, and some at the exit, all facing the casino's customer parking lot. Several times during the day security personnel for Casino Pauma told the employees that they could not distribute flyers near the valet driveway, directing them instead to distribute flyers at the back of the casino, near the employee-only entrance. When the leafleting employees asked what would happen if they stayed at the valet entrance, the security employees told them they would be reported to human resources and disciplined, and that they could potentially lose their jobs. Each group of employees stopped distributing leaflets after being told to do so. In the afternoon, a security guard took a picture of two leafleting employees.

The next month, in January 2014, another Casino Pauma employee handed out Union flyers to several employees waiting to clock out at the end of their shifts. The time clock was located in a hallway near the employee cafeteria. The leafleting employee was on her break. The three employees to whom she gave flyers had not yet clocked out for the end of their shift, but were standing in line to do so; all three clocked out within "about 30 seconds" of receiving the flyers. In March, Casino Pauma issued the leafleting employee a disciplinary warning for distributing the flyers.

The General Counsel of the NLRB filed several complaints concerning the literature distribution incidents.[1] The complaints were consolidated, and an Administrative Law Judge ("ALJ") presided over a three-day trial. The ALJ held that Casino Pauma violated the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, in most of the ways the General Counsel alleged—in particular, it committed unfair labor practices by trying to stop union literature distribution in guest areas at the casino's front entrance and in non-working areas near its employees' time clock. A three-member panel

---

[1] Specifically, the General Counsel alleged that Casino Pauma violated NLRA section 8(a)(1), 29 U.S.C. § 158(a)(1): "(1) [by] maintaining a rule in its employee handbook prohibiting distribution of literature in 'working or guest areas' at any time; (2) by interfering with the distribution of union literature by employees near the public entrance to its casino; (3) by threatening employees with discipline for distributing union literature at that location; (4) by taking a photograph of an employee who was distributing union literature; (5) by interrogating an employee about her union activity; and (6) by directing an employee to keep a discussion about possible discipline as confidential." The complaint also alleged that Casino Pauma committed unfair labor practices under NLRA sections 8(a)(1) and 8(a)(3) by (7) "issuing a written disciplinary warning to an employee for engaging in union activity"—in particular, distributing union literature near the employees' time clock.

of the Board affirmed the ALJ's rulings and findings and adopted a slightly modified version of the ALJ's order. *Casino Pauma* (*Casino Pauma II*), 363 N.L.R.B. No. 60 (Dec. 3, 2015).

In so doing, the Board relied on a jurisdictional finding involving the same parties it had made earlier that year in *Casino Pauma* (*Casino Pauma I*), 362 N.L.R.B. No. 52 (Mar. 31, 2015), a Board decision from which neither party sought judicial review. In *Casino Pauma I*, which concerned other unfair labor practices that took place at the same casino in April 2013, the Board rejected Casino Pauma's argument that it was a government entity not subject to the NLRA. *Id.* at 1 n.3; 3–4. Although Casino Pauma renewed this argument in *Casino Pauma II*, the case now before this panel, the Board held that "the doctrine of issue preclusion . . . forecloses the Respondent from arguing that the Board lacks jurisdiction." *Casino Pauma II*, 363 N.L.R.B. No. 60 at 1 n.1.

After the Board issued its decision in *Casino Pauma II*, it timely petitioned this court for enforcement of its order, 29 U.S.C. § 160(e), and Casino Pauma filed a separate petition for review, 29 U.S.C. § 160(f). We consolidated the two petitions. UNITE HERE intervened in opposition to Casino Pauma. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers, Local 283 v. Scofield*, 382 U.S. 205, 208 (1965).

## II.

Casino Pauma argues that the Board misinterpreted the NLRA and principles of federal Indian law by adjudicating unfair labor charges against it in light of its status as a tribally-owned business operating on tribal land. Before

addressing this argument, we consider whether Casino Pauma is precluded from making it.[2]

The Union, but not the Board, contends that Casino Pauma is issue-precluded from arguing before us that it may not be regulated by the Board under the NLRA. The Union notes that the issue was resolved by the NLRB in a previous decision, *Casino Pauma I*, and that the Casino did not seek judicial review of that decision.

The Union is correct that collateral estoppel, also known as issue preclusion, "is not limited to those situations in which the same issue is before two *courts*. Rather, where a single issue is before a court and an administrative agency, preclusion also often applies." *B & B Hardware v. Hargis Indus.*, 135 S. Ct. 1293, 1303 (2015). Generally speaking, so long as "an administrative agency is acting in a judicial capacity and resolv[ing] disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," *United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 422 (1966), "the federal common law rules of preclusion . . . extend to . . . administrative adjudications of legal as well as factual issues, even if unreviewed," *Guild Wineries & Distilleries v. Whitehall Co.*, 853 F.2d 755, 758–59 (9th Cir. 1988). Further, this court has held that preclusion "doctrines apply to administrative determinations . . . of the [National Labor Relations] Board." *Bldg.*

---

[2] We do not discuss here the application of preclusion doctrines *within* administrative proceedings before the NLRB, *i.e.*, we do not consider the Board's application of preclusion doctrines to prevent a party from re-arguing an issue before it that the party had already argued in an earlier Board proceeding. Instead, our focus is on the application of issue preclusion in *court*, *i.e.*, in the adjudication of petitions for review and enforcement.

*Materials & Constr. Teamsters v. Granite Rock Co.*, 851 F.2d 1190, 1195 (9th Cir. 1988); *see Granite Rock Co. v. Int'l Bhd. of Teamsters*, 649 F.3d 1067, 1070 (9th Cir. 2011); *Paramount Transp. Systems v. Chauffeurs, Teamsters & Helpers, Local 150*, 436 F.2d 1064, 1065–66 (9th Cir. 1971).

In considering the issue-preclusive effect of NLRB rulings, we have not before addressed the proposition, put forth by the Board at oral argument in explanation of its omission of a preclusion argument from its briefing in this court, that preclusion doctrines do not apply to Board orders as to which the Board has declined to seek judicial enforcement. There may indeed be good reason not to apply preclusion principles to unenforced Board orders. Unlike other federal administrative determinations, the Board's orders do "not have the force of law." 2 John E. Higgins, Jr., *The Developing Labor Law* 2990 (6th ed. 2012). "If the party or parties against which a Board order has been issued refuse to obey, the Board has no authority to compel compliance or punish noncompliance" unless it "appl[ies] to an appropriate U.S. court of appeals" for an order of enforcement. *Id.*; *see* 29 U.S.C. § 160(e). Orders not enforced by the Board thus do not share the same status as many other administrative matters "already resolved as between . . . [the] parties" by the time they arrive at the courthouse; until enforced by the courts, the Board's orders may not be fully "resolved" for preclusion purposes. *Utah Constr. & Mining Co.*, 384 U.S. at 422 (footnote omitted). A litigant may, for example, legitimately wish to settle a case even if there is no enforceable order, to save either time or money. Applying preclusion to an unenforced order would discount the opportunity presented in the NLRA's enforcement scheme by encouraging litigants to seek review where even minor unfair labor practices, with minimal relief, are at stake.

But we need not resolve the preclusive effect in court of unenforced NLRB determinations. Even if issue preclusion principles fully applied to the NLRB's unenforced decision in *Casino Pauma I*, Casino Pauma would not be precluded from making its arguments before us.

Issue preclusion is a waivable defense. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998); *Clements v. Airport Auth. of Washoe Cty.*, 69 F.3d 321, 329 (9th Cir. 1995). The Board has affirmatively waived any preclusion defense before this court, deciding instead to litigate the question of its ability to regulate tribes under the NLRA on the merits.

When a party "entitled to raise a preclusion defense fails to do so, it may be concluded that a third party cannot undo the waiver." 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4405 (3d ed. 2017). So here. We are disinclined to allow the Union to supply a preclusion defense on behalf of the Board through the Union's status as an intervenor. The Union was not a party to the administrative proceedings now on review; the Board, which *was*, may legitimately wish for a resolution in the courts of the jurisdictional issue advanced in the administrative proceedings, so as to have it settled for other cases and circumstances that it, but not the Union, will face in the future.

The Board has intentionally relinquished any preclusion defense, even though the primary burden of litigating the issue before us falls on it. Although "we have the ability to overlook waiver" when it comes to preclusion, *Clements*, 69 F.3d at 329, we will not do so here. We proceed to the merits.

**III.**

Casino Pauma first challenges as unreasonable the Board's interpretation of the NLRA under which it has adjudicated unfair labor charges against tribal employers. Second, it vigorously argues that the Ninth Circuit's precedents concerning the applicability of federal statutes to Indian tribes are wrong and outdated—but also, if those precedents had been properly applied here, the Board would have found Casino Pauma not an NLRA-covered employer.

We disagree on all counts. Although the NLRA is ambiguous as to its application to tribal employers, the Board's determination that such employers are covered by the Act is a "reasonably defensible" interpretation of the NLRA. *United Nurses Ass'ns. of Cal. v. NLRB*, 871 F.3d 767, 777 (9th Cir. 2017) (internal quotation marks omitted). And, contrary to Casino Pauma's contentions, application of federal Indian law does not produce a different result in this case.

**A.**

The National Labor Relations Board is authorized to resolve NLRA-covered disputes concerning employers engaged in unfair labor practices "affecting commerce." 29 U.S.C. § 160(a). In the NLRA, as relevant here, "[t]he term 'employer' includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof . . . ." 29 U.S.C. § 152(2). The statute thus exempts federal and state governments from its application but is silent as to Indian tribes.

*San Manuel Indian Bingo and Casino*, 341 N.L.R.B. 1055 (2004), the Board's controlling interpretation of the NLRA's application to tribes, held that the term "employer" in the NLRA includes tribal employers, subject to certain prudential limits not here relevant. As the Board acknowledged in *San Manuel*, it had earlier taken several different approaches to the NLRA's coverage of tribal employers. First, in the 1970s and 1980s, the Board held that tribal employers were completely excluded from the NLRA. Then, in the 1990s, the Board determined that tribal employers *were* subject to the NLRA as long as the tribal enterprise was not located on tribal land. *San Manuel*, 341 N.L.R.B. at 1056–57 (citing *Fort Apache Timber Co.*, 226 N.L.R.B. 503 (1976); *S. Indian Health Council*, 290 N.L.R.B. 436 (1988); *Sack & Fox Indus.*, 307 N.L.R.B. 241 (1992); *Yukon Kuskoswim Health Corp.*, 328 N.L.R.B. 761 (1999)).

After summarizing these zigzagging precedents, *San Manuel* concluded that the Board's "jurisprudence in this area during its 30 years of development has been inadequate in striking a satisfactory balance between the competing goals of Federal labor policy and the special status of Indian tribes in our society and legal culture," and that "[a]s a result, the Board's assertion of jurisdiction has been both underinclusive and overinclusive." *San Manuel*, 341 N.L.R.B. at 1056. In particular, *San Manuel* noted that the NLRA's definition of an employer "[o]n its face . . . does not expressly exclude Indian tribes from the Act's jurisdiction." *Id.* at 1058. "[T]ribes are not a corporation of the Government and they are not a Federal Reserve Bank," "[n]or do Indian tribes meet the Board's or reviewing courts' traditional definition of a State or political subdivision thereof." *Id.* Recognizing that "[t]he Supreme Court 'has consistently declared that in passing the National Labor Relations Act, Congress intended

to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause,'" *id.* at 1057 (quoting *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963) (emphasis in original)), *San Manuel* held that section 152(2)'s exemptions "are to be narrowly construed," and should not be read to exempt an unmentioned type of governmental entity. *Id.* at 1058.

*San Manuel* further noted that no historical or other considerations suggest that tribes are exempt from the Act. Congress apparently did not discuss the NLRA's application to tribes when adopting the Act, nor do any statutes addressing tribal self-government mention the NLRA. *Id.* Additionally, other federal employment statutes, such as Title VII of the Civil Rights Act of 1964 and Title I of the Americans with Disabilities Act, do define the word "employer" to exclude Indian tribes; the absence of that exclusion in the NLRA is reasonably given effect by *including* tribes, the Board indicated. *Id.*

We have held plausible—but did not have occasion definitively to rule upon—this same understanding of the NLRA. In *NLRB v. Chapa-De Indian Health Program, Inc.*, 316 F.3d 995, 997 (9th Cir. 2003), the NLRB had issued a subpoena to a tribal organization and sought to enforce it in district court. Courts enforce such subpoenas unless "the NLRB 'plainly lacks' jurisdiction." *Id.* So the question before this court was whether Indian tribes are "plainly" not employers under the NLRA.

In *Chapa-De*, we recognized that "Indian tribes are not expressly exempted from the scope of the NLRA's definition of 'employer.'" *Id.* at 1001. And we were persuaded that the NLRA *could* be interpreted to apply to tribal employers, as

the tribal organization there did not identify any consideration that "indicate[d] that Congress intended the NLRA not to apply to Indian tribes . . . ." *Id.* Our conclusion was that the NLRB did not "plainly lack[]" jurisdiction over the tribal employer, and that the subpoena was therefore enforceable. *Id.*

Unlike *Chapa-De*, this case requires us directly to address the NLRA tribal coverage issue. Doing so, we uphold *San Manuel*'s determination that tribal employers are subject to the NLRA.

"The *Chevron* doctrine requires that this court defer to the NLRB's interpretation of the NLRA if its interpretation is rational and consistent with the statute." *SEIU, United Healthcare Workers-West v. NLRB*, 574 F.3d 1213, 1214 (9th Cir. 2009) (internal quotation marks omitted). *San Manuel*'s holding that tribal employers are within the NLRA's coverage meets that standard, as it is a "reasonably defensible" interpretation of the statute's definition of "employer." *United Nurses*, 871 F.3d at 777 (internal quotation marks omitted). The absence of tribal governments from the "employer" definition's list of exclusions, the NLRA's silence otherwise as to any exception for the statute's application for tribes, and the comparison made in *Chapa-De* to otherwise similar employment definitions in various federal employment statutes that explicitly exclude tribes from their application all strongly support the Board's construction of the NLRA as reaching tribes sufficiently engaged in interstate commerce.

Casino Pauma, and its amici Fort Peck Assiniboine and Sioux Tribes, *et al.*, disagree. They maintain that the Board could not reasonably interpret the NLRA as covering tribes,

for two reasons: because the NLRA generally "draw[s] a sharp distinction between private and public employers," and because the Board has long had a regulation defining a "State" to include "the District of Columbia and all States, territories, and possessions of the United States," 29 C.F.R. § 102.1(g), entities as to which, the amici maintain, tribes are analogous.

Perhaps it would be reasonable to read the NLRA's exclusions of many public employers to extend to *all* public employers, including tribes, given the law's focus on private employment. And perhaps it would be reasonable to view the NLRA's silence as to tribes as without import, given the broad definition the Board has given to the term "State" in the "employer" definition's list of exclusions. But those possibilities do not mean that the Board's contrary interpretation of the Act's silence as to tribes is unreasonable. Although the Board once found arguments similar to amici's persuasive and thus excluded tribes from the NLRA's reach, *see Fort Apache*, 226 N.L.R.B. at 505–06, "a Board rule is entitled to deference even if it represents a departure from the Board's prior policy." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990); *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005). Under these circumstances—in which both the Board and the parties present reasonable interpretations of an ambiguous provision in the NLRA—the court must defer to the Board's conclusions respecting the meaning of federal labor law. *United Nurses*, 871 F.3d at 777 (citing *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398–99 (1996)).

**B.**

We turn to whether the Board's approach is unacceptable as a matter of federal Indian law.  We review de novo the Board's conclusions as to federal Indian law, as Indian law is "outside the NLRB's 'special expertise.'" *NLRB v. Int'l B'hd of Elec. Workers, Local 48*, 345 F.3d 1049, 1054 (9th Cir. 2003); *cf. Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 143–44 (2002).

Casino Pauma contends that the Board's reasoning must be trumped by competing principles of federal Indian law—principles, it argues, the Board failed fully to consider in its adoption and application of *San Manuel*'s tribal coverage holding.  That argument lacks merit.

*Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir. 1985), established a three-part test for determining when a federal law of "general applicability" applies to tribes:

> A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if:  (1) the law touches 'exclusive rights of self-governance in purely intramural matters'; (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'; or (3) there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations. . . .'  In any of these three situations, Congress must *expressly* apply a

statute to Indians before we will hold that it reaches them.

*Id.* (internal citation omitted).

Applying this test, *Coeur d'Alene* held that the Occupational Safety and Health Act ("OSHA") applied to a tribe-owned farm located on tribal land, as the tribe had failed to prove any of the three circumstances that justify excluding it from OSHA. As to the tribe's main argument—that OSHA would interfere with tribal self-government—we observed that "the tribal self-government exception is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes." *Id.* And we went on to hold that "[b]ecause the Farm employs non-Indians as well as Indians, and because it is in virtually every respect a normal commercial farming enterprise, . . . its operation free of federal health and safety regulations is 'neither profoundly intramural . . . nor essential to self-government.'" *Id.*

In the decades that followed, "[w]e have consistently applied *Coeur d'Alene* and its progeny to hold that generally applicable laws may be enforced against tribal enterprises." *CFPB v. Great Plains Lending, LLC*, 846 F.3d 1049, 1053 (9th Cir. 2017); *see also Solis v. Matheson*, 563 F.3d 425, 429–37 (9th Cir. 2009); *United States v. Baker*, 63 F.3d 1478, 1484–86 (9th Cir. 1995); *Lumber Indus. Pension Fund v. Warm Springs Forest Products Indus.*, 939 F.2d 683, 685–86 (9th Cir. 1991). While so doing, we have been particularly careful to distinguish tribal enterprises from tribal entities engaging in self-government. *See Snyder v. Navajo Nation*, 382 F.3d 892, 895–96 (9th Cir. 2004) (holding a tribal law

enforcement agency exempt from the Fair Labor Standards Act); *EEOC v. Karuk Tribe Housing Auth.*, 260 F.3d 1071, 1079–80 (9th Cir. 2001) (holding a tribal housing authority exempt from the Age Discrimination in Employment Act); *see also United States ex rel. Cain v. Salish Kootenai Coll., Inc.*, 862 F.3d 939, 943 (9th Cir. 2017) (holding that a tribe-related college may or may not be exempt from the False Claims Act, depending on further factual development).[3]

In this case, as in those just discussed, we deal with a law of general applicability. *Chapa-De* so recognized, noting that "the NLRA is not materially different from the statutes that we have already found to be generally applicable," and "conclud[ing] that just as OSHA, ERISA and [the Contraband Cigarette Trafficking Act] are statutes of general applicability, so too is the NLRA." 316 F.3d at 998.

Nor are any of the *Coeur d'Alene* exceptions here pertinent. The Pauma Band has no treaty at all with the federal government, so there can be no treaty violation in applying the NLRA to the Tribe. As we have discussed, there is no proof one way or the other that Congress meant to preclude the NLRA's application to tribes. And, most important, the NLRA's application to a tribe-owned casino

---

[3] We are not alone in our adoption and application of the *Coeur d'Alene* factors, although our legal framework is not without its critics. "[T]he Second, Seventh, Ninth, Eleventh, and now Sixth, Circuits, apply the *Coeur d'Alene* framework to determine whether statutes of general applicability apply to Indian tribes, the Eighth and Tenth Circuits reject it, and the D.C. Circuit applies a fact-intensive analysis." *Soaring Eagle Casino & Resort v. NLRB*, 791 F.3d 648, 673 (6th Cir. 2015); *see* Cohen's Handbook of Federal Indian Law § 21.02[5][c], p. 1337 (2012) (noting that courts "frequently invoke" *Coeur d'Alene* in the labor and employment context).

such as Casino Pauma does not affect "purely intramural matters" or the Tribe's "self-government." *Coeur d'Alene*, 751 F.2d at 1116. Casino Pauma is not "the tribal government, acting in its role as provider of a governmental service"; rather, "[i]t is . . . simply a business entity that happens to be run by a tribe or its members." *Karuk Tribe*, 260 F.3d at 1080. The labor dispute that gave rise to this case is not an "intramural" one "between the tribal government and a member of the Tribe," *id.* at 1081, but rather one between a tribe-owned business and its employees, "[t]he vast majority" of whom "are not members of any Native American Tribe." In this regard, Casino Pauma is much like the tribe-owned farm in *Coeur d'Alene*—a business that "employs non-Indians as well as Indians," and "is in virtually every respect a normal commercial . . . enterprise," such that "its operation free of federal [labor law] is 'neither profoundly intramural . . . nor essential to self-government.'" 751 F.2d at 1116.

In sum, federal Indian law does not preclude the Board's application of the NLRA to Casino Pauma.

Not surprisingly, Casino Pauma disagrees with this conclusion, maintaining that the *Coeur d'Alene* Congressional intent prong is flipped in the wrong direction. Under the sovereign immunity principles outlined in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978), and affirmed in *Michigan v. Bay Mills Indian Community*, 134 S. Ct. 2024 (2014), Casino Pauma maintains, generally applicable laws may be enforced against tribes only if an intent to do so is clear, rather than if there is no clear intent to the contrary.

Casino Pauma is, of course, correct that "considerations of Indian sovereignty [serve] as a backdrop against which . . .

applicable federal statute[s] must be read." *Santa Clara Pueblo*, 436 U.S. at 60 (original alterations and quotation marks omitted).  That is why, in both *Santa Clara Pueblo* and *Bay Mills*, the Supreme Court concluded that suits brought by a private party and a state, respectively, failed in light of Congress's silence as to whether those suits were authorized against tribes.  *See id.* at 59, 70; *Bay Mills*, 134 S. Ct. at 2039.

Even so, the sovereign immunity cases upon which Casino Pauma relies do not counsel against the enforcement of the NLRA here.  Those cases focus on disputes between *non-federal* parties and tribes and so are not directly relevant.  From the outset, this case, like all other NLRA unfair labor practice cases, was brought by a federal governmental actor, the General Counsel of the National Labor Relations Board—first before the Board, and now for enforcement of the Board's order in this court.**[4]**  The NLRB General Counsel

---

**[4]** "Enforcement of the NLRA's prohibition against unfair labor practices is accomplished through a split-enforcement system, assigning all prosecutorial functions to the General Counsel of the NLRB and all adjudicatory functions to the Board."  *Beverly Health & Rehab. Servs. v. Feinstein*, 103 F.3d 151, 152 (D.C. Cir. 1996).  "[T]he process of adjudicating unfair labor practice cases begins with the filing by a private party of a 'charge.'"  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975).  The General Counsel reviews and investigates the charge, and private parties "participate in this investigatory process only to the extent of furnishing facts . . . and informally presenting their theories."  Higgins, Jr., *The Developing Labor Law* at 2858.

"Congress has delegated to the Office of General Counsel . . . the unreviewable authority to determine whether a complaint shall be filed. . . .  In those cases in which he decides not to issue a complaint, no proceeding before the Board occurs at all."  *Sears, Roebuck & Co.*, 421 U.S. at 138–39 (internal quotation marks and citations omitted); *see* 29 U.S.C. § 153(d).  "In those cases in which he decides that a complaint shall issue, the General Counsel becomes an advocate before the Board in

"seeks enforcement [of the NLRA] as a public agent," not on behalf of any private party or private right. *Amalgamated Utility Workers v. Consol. Edison Co. of N.Y.*, 309 U.S. 261, 269 (1940).

Unlike state governments and private parties, "the United States may sue Indian tribes and override tribal sovereign immunity." *United States v. Yakima Tribal Court*, 806 F.2d 853, 861 (9th Cir. 1986); *see* Cohen's Handbook of Federal Indian Law § 7.05[1][a], p. 637 (2012) ("Indian nations are not immune from lawsuits filed against them by the United States"). "We know of no principle of law (and the Tribe does not cite any) that differentiates a federal agency . . . from 'the United States itself' for the purpose of sovereign immunity analysis." *Karuk Tribe Housing Auth.*, 260 F.3d at 1075 (applying "the clear rule" that, like states, "Indian tribes do not enjoy sovereign immunity against suits brought by the federal government"). As the NLRB General Counsel brings suit on behalf of the NLRB, an agency of the United States, to enforce public rights, the sovereign immunity and concomitant statutory interpretation considerations applicable to suits brought against tribes by nonfederal parties, private and governmental, do not apply.[5]

---

support of the complaint." *Id.* The General Counsel can dismiss or settle the unfair labor practice claim without the charging party's consent. *See* Higgins, Jr., *The Developing Labor Law* at 2859–64. The charging party may only participate in unfair labor practice hearings as a separate party, and is not represented by the General Counsel. *Scofield*, 382 U.S. at 217–21; *see* 29 C.F.R. §§ 102.1(h), 102.38.

[5] Further, although Casino Pauma does not acknowledge it, there is a conceptual distinction between the procedural question whether tribal sovereign immunity bars a lawsuit and the substantive question whether a federal law applies to a tribe. "To say substantive . . . laws apply . . . is

We note, finally, that both of the other circuit courts to consider the issue have upheld the Board's determination that tribe-owned casinos can be NLRA-covered employers. *See San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306, 1308 (D.C. Cir. 2007); *NLRB v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 555–56 (6th Cir. 2015). After reviewing our NLRA case law, the statute, and federal Indian law principles as enunciated in the applicable precedents, we agree with those Circuits and hold that the NLRA governs the relationship between Casino Pauma and its employees.

## C.

In a final attempt to limit the NLRA's application, Casino Pauma vaguely suggests—and amici California Nations Indian Gaming Association *et al.* argue somewhat more fully—that we must take into account the labor provisions of Casino Pauma's compact with California under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710(d). *See In re Indian Gaming Related Cases*, 331 F.3d 1094, 1095–1106 (9th Cir. 2003); *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1159–63 (9th Cir. 2015). Amici contend, in particular, that IGRA's provisions, as implemented through a California-Tribe compact providing for a labor dispute resolution mechanism, are "in direct conflict with many provisions of the NLRA."

---

not to say that a tribe no longer enjoys immunity from suit. . . . There is a difference between the right to demand compliance with . . . laws and the means available to enforce them." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 755 (1998).

We have not uncovered any conflict between the NLRA and IGRA. Under IGRA, a certain class of gaming, including that class historically offered at Casino Pauma, *see Pauma Band*, 813 F.3d at 1160–62, is "lawful on Native American lands only if such activities are conducted pursuant to a Tribal-State Compact entered into by the tribe and a state that permits such gaming, and the Compact is approved by the Secretary of the Interior," *id.* at 1160; *see* 25 U.S.C. § 2710(d). IGRA provides in relevant part that "[a]ny Tribal-State compact . . . may include provisions relating to . . . the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity." 25 U.S.C. § 2710(d)(3)(C). Through this compact system, IGRA constitutes "an example of 'cooperative federalism' in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003) (internal quotation marks omitted).

At the same time, IGRA "does not . . . immunize the operation of Indian commercial gaming enterprises from the application of other generally applicable congressional statutes." *NLRB v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 553 (6th Cir. 2015). There is no IGRA provision stating an intent to displace the NLRA—or any other federal labor or employment law, for that matter. IGRA's general allowance that state-tribe compacts "may include provisions relating to . . . the application of . . . civil laws" in no way signifies that compacts *must* include certain state labor law provisions—or that, if the compacts do, those provisions trump otherwise applicable federal laws. 25 U.S.C. § 2710(d)(3)(C). As the D.C. Circuit put the

matter, "IGRA certainly permits tribes and states to regulate gaming activities, but it is a considerable leap from that bare fact to the conclusion that Congress intended federal agencies to have no role in regulating employment issues that arise in the context of tribal gaming." *San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306, 1318 (D.C. Cir. 2007); *accord Little River*, 788 F.3d at 553–54.

We conclude that Casino Pauma's compact with California does not displace the application of the NLRA to its activities.[6]

## IV.

On the merits of the unfair labor charge complaint, the Board held that Casino Pauma violated section 8(a)(1) of the NLRA by disciplining an employee "for distributing Union literature [i]n a non-working area during non-working time;" "[b]y maintaining and enforcing a rule in its employee handbook prohibiting the distribution of literature in 'guest areas;' by interfering with the distribution of Union literature by employees in these areas, including the public or guest entrances to its casino; by threatening to discipline employees who distributed Union literature in these areas; and by

---

[6] For similar reasons, we reject Casino Pauma's request to stay the Board's petition for enforcement and its petition for review pending resolution of a contract case it filed against the Union, *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. UNITE HERE*, No. 16-02660 (S.D. Cal.). Casino Pauma argues that the district court in that case will be presented with more relevant evidence concerning the relationship between the NLRA and the California-Tribe compact made pursuant to IGRA. There is no need for, and no precedent supporting, staying these petitions for review and enforcement pending resolution of a district court case against the Union concerning IGRA.

photographing employees who distributed Union literature in these areas." *See* 29 U.S.C. § 158(a)(1). The Board ordered Casino Pauma to take a variety of actions to remedy these NLRA violations.

## A.

First, some procedure. Under section 10(e) of the NLRA, we have jurisdiction only to consider arguments raised before the NLRB "absen[t] . . . 'extraordinary circumstances.'" *NLRB v. Legacy Health Sys.*, 662 F.3d 1124, 1126 (9th Cir. 2011) (quoting 29 U.S.C. § 160(e)). "The purpose of this provision is to ensure that the Board is given the opportunity to bring its expertise to bear on the issue presented so that we may have the benefit of the Board's analysis when reviewing the administrative determination." *NLRB v. Int'l Bhd. of Elec. Workers, Local 952*, 758 F.2d 436, 439 (9th Cir. 1985).

The Board and Union argue that Casino Pauma did not exhaust before the Board the principal merits argument it makes before us—that, under *Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945), Casino Pauma did not violate NLRA section 8(a)(1) by preventing employees from distributing union literature to customers in front of the casino. We hold that there is no exhaustion bar to our consideration of the Casino's main *Republic Aviation* argument.

Casino Pauma's exceptions to the ALJ's order were indeed quite general. But the General Counsel sufficiently understood Casino Pauma to be making an argument concerning the proper scope of *Republic Aviation* as applied to literature distribution rights outside casinos to make a specific counter-argument on that issue in its brief to the

Board. And the Board also got the gist of the argument: it approved the ALJ's holding that, in light of *Republic Aviation*, "It is by now well-settled that employees are allowed, absent unusual or special circumstances, to distribute union literature on their employer's premises during nonwork time in nonwork areas." *See also* Concurring Opn. of Member Miscimarra (noting his "agree[ment] with the judge and his colleagues that the Respondent violated Sec. 8(a)(1) by maintaining a rule prohibiting employees from distributing literature in 'guest areas,'" but noting that he "would not find, in every case, that the area immediately outside a hotel entrance is a non-work area").

"Ordinarily, when an agency has actually addressed an issue, the policies underlying the exhaustion doctrine . . . are satisfied." *W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1203 (9th Cir. 2008) (citing *Abebe v. Gonzales*, 432 F.3d 1037, 1041 (9th Cir. 2005) (en banc)). So here: the NLRB's consideration of the issue was sufficient for purposes of exhaustion, and this panel has jurisdiction to consider the merits.

## B.

Section 7 of the NLRA establishes, as relevant here, employees' "right to self-organization, to form, join, or assist labor organizations . . . , and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157; *see also* 29 U.S.C. § 158(a)(1). Casino Pauma's central merits contention is that the Board misapplied the NLRA in determining that its employees had a section 7 right to distribute union literature to patrons on the front driveway of its casino.

Under well-established law, this contention about the reach of NLRA section 7's protection gives rise to two questions. "The first is whether, apart from the location of the activity, [literature] distribution" to consumers "is the kind of concerted activity that is protected from employer interference by §§ 7 and 8(a)(1) of the National Labor Relations Act." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 563 (1978). The second is "whether the fact that the activity takes place on petitioner's property gives rise to a countervailing interest that outweighs the exercise of § 7 rights in that location." *Id.*

The answer to the first question is evident. Section 7 has long been understood to protect as concerted activity appeals to the public for support of employees' workplace controversies. "Section 7 protects the right of employees 'to improve terms and conditions of employment . . . through channels outside the immediate employee-employer relationship.'" *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1153 (9th Cir. 2003) (quoting *Eastex*, 437 U.S. at 565). Employees thus have an "undisputed right to make third party appeals in pursuit of better working conditions," *Sierra Publ'g Co. v. NLRB*, 889 F.2d 210, 217 (9th Cir. 1989) (discussing *NLRB v. Local Union No. 1229* (*Jefferson Standard*), 346 U.S. 464 (1953), and its progeny), including the right to engage in "picketing and handbilling truthfully to inform customers" about an employer's labor practices, *NLRB v. Calkins*, 187 F.3d 1080, 1089 (9th Cir. 1999).

The second question, concerning the import of the employees' location while distributing literature, is only slightly less straightforward. We start with the principle that the NLRA "left to the Board the work of applying the Act's general prohibitory language in the light of the infinite

combinations of events which might be charged as violative of its terms." *Republic Aviation*, 324 U.S. at 798. So, in reviewing solicitation and distribution rules established by the Board, "[t]he judicial role is narrow: The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978) (footnote omitted).

*Republic Aviation* approved a Board baseline rule for the location of workplace union solicitation and literature distribution protected by section 7:

> Since "working time is for work," a rule prohibiting employee solicitation and distribution of literature during work time is presumed to be valid. On the other hand, "the time outside (work), whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint," even though he is on company property. Therefore, a rule prohibiting employee solicitation or distribution of literature during nonworking time in nonwork areas is presumptively invalid unless special circumstances warrant the adoption of the rule.

*NLRB v. Silver Spur Casino*, 623 F.2d 571, 582 (9th Cir. 1980) (summarizing *Republic Aviation*, 324 U.S. at 803 n.10).

*Republic Aviation*, and much of its progeny, concerned employee solicitation of and literature distribution to fellow employees. Here, the leafleting occurred in areas frequented by casino customers and was directed at those customers. But, as the D.C. Circuit has noted, "neither [the] court[s] nor the Board ha[ve] ever drawn a substantive distinction between solicitation of fellow employees and solicitation of nonemployees." *Stanford Hosp. & Clinics v. NLRB*, 325 F.3d 334, 343 (D.C. Cir. 2003); *accord New York-New York, LLC v. NLRB*, 676 F.3d 193, 196–97 (D.C. Cir. 2012). Nor is there any basis for such a distinction: the balancing of interests accomplished in *Republic Aviation* accounts for an employer's "property right . . . in preventing employees from bringing literature onto its property and distributing it there—not in choosing which distributions protected by § 7 it wishes to suppress." *Eastex*, 437 U.S. at 573 (footnote omitted).[7]

We cannot identify, and the parties have not raised, any reason to require the Board to treat section 7 protected solicitation differently with regard to location or timing based on the intended audience. The rationales for *Republic Aviation*'s principle—that "[t]he freedom to communicate is essential to the effective exercise of organizational rights," and that "the time outside (work), . . . is an employee's time

---

[7] By contrast, *non-employee* union organizers may be excluded from soliciting employees on an employer's property under the separate rule established in *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105 (1956), and applied in *Lechmere, Inc. v. NLRB*, 502 U.S. 527 (1992). That rule "[s]trike[s] a balance between § 7 organizational rights and an employer's right to keep strangers from entering on its property," while, under *Republic Aviation*, "[a] wholly different balance [is] struck when the organizational activity [is] carried on by employees already rightfully on the employer's property." *Eastex*, 437 U.S. at 571–72.

to use as he wishes without unreasonable restraint, even though he is on company property," *Silver Spur*, 623 F.2d at 581–82—apply to solicitation of customers as well as to solicitation of fellow employees. And the employment site "is a particularly appropriate place for the distribution of § 7 material," *Eastex*, 437 U.S. at 574, as to both employees and customers; for both audiences, the employment site is the most convenient and logical place to encounter the intended audience and to discuss labor matters.

We conclude that the Board properly interpreted *Republic Aviation*'s holding concerning section 7 to reach employees' customer-directed union literature distribution on non-work time in non-work areas of the employer's property.

As to the particular application of *Republic Aviation* here, the Board reasonably applied to Casino Pauma its literature distribution rules concerning casinos. "The Board has special rules to determine what constitutes a working area for each industry. In a retail store, for example, the working area is the selling floor where the employer makes retail sales, but not the other public spaces." *New York-New York*, 676 F.3d at 197 (internal citations omitted). In hotels and casinos, "the Board has long concluded that the working areas are the hotel rooms and gaming areas because a hotel-casino's main function is to lodge people and permit them to gamble." *Id.* (internal citations and quotation marks omitted).

A trio of Board cases were the source of the delineation summarized in *New York-New York*: *Dunes Hotel*, 284 N.L.R.B. 871 (1987), *Flamingo Hilton-Laughlin*, 330 N.L.R.B. 287 (1999), and *Santa Fe Hotel, Inc.*, 331 N.L.R.B. 723 (2000). Those cases reasoned that entrances to hotels and casinos, along with certain other

"guest" areas incidental to the businesses' main operations, are non-work areas in which non-working employees may distribute literature to guests and other non-employees.

The case most closely on point is *Santa Fe Hotel*. There, the Board concluded that because "the main function of the Respondent's hotel-casino is to lodge people and permit them to gamble," "[t]he 'work activity' . . . at the hand-billed entrances outside its hotel-casino—including security, maintenance, and gardening—is incidental to this main function. To hold that this is a work area (where handbilling cannot occur) would . . . effectively destroy the right of employees to distribute literature." *Santa Fe Hotel*, 331 N.L.R.B. at 723 (internal quotation marks and footnote omitted).

Applying those cases to Casino Pauma, the ALJ determined, and the Board agreed, that "the valet driveway leading to the public entrance to the Respondent's casino was a non-working area." Because Casino Pauma's main function is to provide space for its patrons to gamble, space near its front driveway and entrance is "incidental to this main function." *Id.* Addressing nearly identical facts, the D.C. Circuit approved the *Santa Fe Hotel* holding concerning leafleting of customers at the front driveway and entrance to a hotel, "[i]n light of . . . the deference we owe to the Board on a question of this kind." *New York-New York*, 676 F.3d at 197.

Casino Pauma nonetheless maintains that we should disapprove the Board's cases concerning which areas of hotels and casinos are non-work spaces for purposes of *Republic Aviation*. But, again, "it is the Board upon whom the duty falls in the first instance to determine the relative

strength of the conflicting interests and to balance their weight." *Beth Israel*, 437 U.S. at 504. Casino Pauma does not point to any evidence in the record suggesting that the Board's standards inappropriately balance employees' section 7 rights against the employer's interests in managing its business, or preclude the employer from assuring its customers' safety and freedom from harassment.

Additionally, in a variant of its Indian law-based jurisdictional argument, Casino Pauma suggests that its sovereign interests as a tribe include a *sovereign* right to exclude non-Indians from its property that transcends the property rights of other employers, and should have been factored into the Board's *Republic Aviation* analysis. This suggestion misconceives the nature of the right actually at issue in this variety of case. "Here, as in *Republic Aviation*, petitioner's employees are 'already rightfully on the employer's property,' so that in the context of this case it is the 'employer's management interests rather than [its] property interests' that primarily are implicated." *Eastex*, 437 U.S. at 573 (quoting *Hudgens v. NLRB*, 424 U.S. 507, 521 n.10 (1976)). As a proprietor of a commercial enterprise, the Tribe's management interests do not differ from those of other employers; we so concluded in applying the *Couer d'Alene* standards to Casino Pauma.

Finally, and most ambitiously, Casino Pauma argues that the Board should reconsider its application of *Republic Aviation*, and perhaps *Republic Aviation* itself, in light of its employees' alternative, easier means of distributing union literature using modern tools of communication such as social media. But, pursuant to another long-established interpretation of the NLRA we have already discussed, *see* n.7, "inquiry into such considerations [of alternative forms of

communication] is made only when *nonemployees* are on the employer's property." *ITT Indus., Inc. v. NLRB*, 413 F.3d 64, 76 (D.C. Cir. 2005) (internal quotation marks and citations omitted); *see Babcock & Wilcox*, 351 U.S. at 113. We have no reason to require the Board to abandon this long-established, reasonable premise, long ago approved by the Supreme Court. Again, the *Republic Aviation* rule is grounded in the recognition that employers have little interest in requiring employees legitimately on the premises and not working to advance their organizational interests somewhere else.

As to Casino Pauma's valet driveway, each of the Board's holdings involved a reasonable application of its literature distribution jurisprudence to facts supported by substantial evidence here: Casino Pauma's literature distribution rule in its handbook was applied to prevent literature distribution in the non-working area of the casino's valet entrance, and thus violated section 8(a)(1);[8] Casino Pauma's prevention of non-working employees from handing out union literature at the entrance violated section 8(a)(1); and its employees' photographing of others handing out union literature

---

[8] The Board found that Casino Pauma's literature distribution rule violated section 8(a)(1) for two alternative reasons: "employees would reasonably construe the rule to restrict Section 7 activity," and "because the rule was in fact applied to restrict the lawful exercise of Section 7 rights." After this case was argued, the Board revised its test as to when employee handbook rules violate section 8(a)(1) and abandoned the "reasonably construe" standard it applied in this case. *See Boeing Co.*, 365 N.L.R.B. No. 154, 1–5 (2017). Here, however, Casino Pauma's literature distribution rule was *actually* applied to restrict section 7 rights. The Board's order that Casino Pauma "[c]ease and desist from . . . [m]aintaining a rule that prohibits employees from distributing literature in 'guest areas'" is therefore enforceable without consideration of the Board's alternative, "reasonably construed" rationale.

constituted inappropriate surveillance and violated section 8(a)(1).

The Board's holding that Casino Pauma violated sections 8(a)(1) and 8(a)(3) by disciplining an employee because she distributed union literature near the casino's time clock was also reasonable.  The employee was on a break, and did not interfere with other employees' working time or working space. The "employees who received the flyers clocked out within 30 seconds or so," and were located "immediately outside the employee break room/cafeteria, in an area removed from the gaming areas or other places that customers or clients have access to."   Under these circumstances, the Board reasonably found that Casino Pauma violated the employee's right to distribute union literature in non-working spaces at a non-working time.

In short, the Board's conclusion that Casino Pauma violated its employees' NLRA right to distribute union literature was adequately supported, both by the applicable legal principles and the record.  We therefore enforce the Board's order.

**V.**

We **GRANT** the National Labor Relations Board's petition for enforcement and **DENY** Casino Pauma's petition for review.